**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CAROLYN RUFF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19-cv-05371 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| JEFFREY K. HAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Carolyn Ruff organized a protest and boycott of Defendant Missha Inc.'s ("Missha") store in Chicago ("Store") after seeing a video of an employee of a different Missha store attacking a customer. Ruff claims that Missha responded to her protest with a campaign of harassment that included multiple calls to the Chicago Police Department ("CPD"). During one incident, CPD officers including Defendants Brenda Thomas, Edwin Drowns, and James Gochee came to the Store and, after speaking with two Store employees, arrested Ruff and brought her to the hospital for a mental-health evaluation. Ruff contends that Defendants violated her Fourth Amendment rights by arresting her and subjecting her to a mental-health evaluation, and by using excessive force when they arrested her. She therefore brought this lawsuit against them under 42 U.S.C. § 1983. Now, Ruff and Defendants each seek summary judgment. (Dkt. Nos. 179, 185.) For the reasons that follow, Defendants' motion is granted and Ruff's motion is denied.

## BACKGROUND

The following facts are undisputed.

In March 2017, there was an incident at a Missha store in North Carolina that led to calls for protests and boycotts of the company. (Pl.'s Am. Resp. to Defs.' Statement of Material Facts

in Supp. of Defs.' Mot. for Summ. J. ("PRDSF") ¶ 5, Dkt. No. 205.) When Carolyn Ruff learned of Missha's Store in Chicago, she decided to organize a boycott of that location. (*Id.* ¶ 6.) Beginning in March 2017, Ruff regularly stood outside the Store to protest Missha. (*Id.* ¶ 7.) Her protests caused numerous conflicts between herself and Store employees that sometimes became physical and resulted in calls to the CPD. (*Id.*) For a period, an order of protection was taken out against Ruff. (*Id.*) Nonetheless, Ruff continued her protests for over two years. (*Id.* ¶¶ 7–8.)

Ruff was protesting outside the Store's entrance on May 31, 2019, when Defendant CPD officers Brenda Thomas and Edwin Drowns arrived on the scene. (Defs.' Statement of Material Facts in Supp. of Defs.' Mot. for Summ. J. ¶ 2, Dkt. No. 180[1]; PRDSF ¶¶ 8, 10.) Displayed on the hood of Ruff's nearby parked car was a sign that read: "HONK YOUR HORN TO SHUT MISSHA; DON'T SHOP AT 642 (MISSHA); They Will BEATCHA." (PRDSF ¶ 9.) Also depicted on the sign were two images taken from video of the 2017 incident that occurred at the North Carolina Missha store. (*Id.* ¶ 9.) Thomas and Drowns walked into the Store and spoke with two of its employees. (*Id.* ¶ 11.) The employees explained to the officers that Ruff would record and livestream customers coming in and out of the Store without their permission, and one of the employees showed the officers a tablet so they could see that Ruff was recording and livestreaming at that very moment. (*Id.* ¶¶ 12, 15.) Both employees also reported that Ruff previously had used a megaphone in connection with her protests. (*Id.* ¶ 20.)

One of the employees told the officers that Ruff had been protesting outside the Store for about two to three years. (*Id.* ¶ 13.) That employee also informed the officers that Ruff would not

---

[1] Ruff did not respond to paragraphs 1 through 4 of Defendants' statement of material facts, and therefore the Court takes the facts set forth in those paragraphs directly from Defendants' initial Local Rule 56.1 submission and treats them as admitted. N.D. Ill. Local Rule 56.1(e)(3) ("Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material.").

only tell customers not to go into the Store but also falsely accuse the Store of selling loose cigarettes and cigarillos. (*Id.* ¶ 14.) He also stated that Ruff would use her phone to film customers going into the Store and tell them not to spend their money there, and then she would ask them how much they spent when they left the Store. (*Id.* ¶¶ 12, 19.) Further, the employee said that Ruff would often record and livestream him leaving the Store while she insulted him, and sometimes she would broadcast his license plate. (*Id.* ¶¶ 16–17.) The employee claimed that, on one occasion, Ruff said something to a drunk person that provoked the drunk person to attack another Store employee. (*Id.* ¶ 18.) He also recalled that Ruff once told her livestream audience that "God told me that my mission in life was to shut Missha down." (*Id.* ¶ 21.) The employee told the officers that Ruff was "delusional" and "bipolar supposedly." (*Id.* ¶ 22.)

After speaking with the Store employees, Thomas and Drowns exited the Store and spoke with Ruff, who confirmed that she was currently livestreaming. (*Id.* ¶ 23.) Shortly thereafter, another CPD officer, Defendant James Gochee, arrived at the Store. (Defs.' Statement of Material Facts in Supp. of Defs.' Mot. for Summ. J. ¶ 2; PRDSF ¶ 24.) Gochee then went into the Store along with Thomas and Drowns and spoke with the Store employees who repeated and elaborated upon what they had already reported to Thomas and Drowns. (PRDSF ¶¶ 24–31.) One of the employees stated that Ruff would frequently call him "Skinny Man" and referred to another coworker as "fat Black girl." (*Id.* ¶ 28.) Moreover, he claimed that the drunk man who had attacked a Store employee had beaten the victim "to a bloody pulp." (*Id.* ¶ 29.) The employee also told Gochee about one time when Ruff stood outside the Store and screamed into a megaphone for two hours. (*Id.* ¶ 30.) He also reported that Ruff falsely informed customers and passersby that Store employees beat people up and sold drugs, and that she would yell at customers for going inside the Store. (*Id.* ¶¶ 25, 31.)

When Gochee finished speaking with the Store employees, all three officers exited the Store and approached Ruff. (*Id.* ¶ 32.) Gochee told Ruff that she was under arrest for protesting without a permit. (Defs.' Resp. to Pl.'s Statement of Material Facts in Supp. of Pl.'s Mot. for Summ. J. ¶¶ 7–8, Dkt. No. 190.) Defendants then handcuffed Ruff and escorted her to a police vehicle. (PRDSF ¶ 33.) As they walked her to the vehicle, Ruff verbally objected to her arrest. (*Id.*) Once she was placed in the police vehicle, Ruff was taken to the University of Chicago Hospital for a mental-health evaluation. (*Id.* ¶ 35.) Ultimately, Ruff was not charged with a crime as a result of the encounter. (*Id.* ¶ 36.)

In her Third Amended Complaint, Ruff asserts several claims related to her years-long protest outside of Missha. Most of those claims have been dismissed. Remaining in the case are Ruff's § 1983 claims against Defendants arising out of her arrest on May 31, 2019.[2] Specifically, Count VII of Ruff's Third Amended Complaint sets forth a claim alleging that Defendants violated her Fourth Amendment right to be free from unreasonable searches and seizures and Count VIII asserts an accompanying failure-to-intervene claim against Defendants.

## DISCUSSION

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). In the case of cross-motions for summary judgment, the Court must take "the facts in the light most favorable to the non-movant, first for one side and then for

---

[2] The other remaining claim that has not been dismissed is a state-law battery claim against Frenchie Wade Lewis. This Court entered Rule 55(a) default as to that Defendant after she was served but failed to appear. (Dkt. No. 160.)

4

the other." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Loc. Union 150, AFL-CIO*, 335 F.3d 643, 648 (7th Cir. 2003).

With her substantive § 1983 claim, Ruff contends that Defendants violated her Fourth Amendment rights by arresting her without probable cause, using excessive force in the course of her arrest, and having her involuntarily hospitalized for a mental-health evaluation. She also asserts a separate § 1983 claim faulting Defendants for failing to intervene to prevent the alleged violations of her Fourth Amendment rights. Defendants deny that any of them violated Ruff's constitutional rights and further argue that, even if they did, they are entitled to qualified immunity.

"Qualified immunity 'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir. 2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The qualified immunity analysis "involves a two-pronged inquiry: (1) whether the facts, read in favor of the non-moving party, amount to a constitutional violation; and (2) whether the constitutional right was clearly established at the time of the alleged violation. The officer wins if the answer to either question is a 'no.'" *Rainsberger v. Benner*, 913 F.3d 640, 647 (7th Cir. 2019) (citation omitted). As to the second prong, "'[c]learly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotation marks omitted). This "demanding standard" requires that the relevant "legal principle . . . have a sufficiently clear foundation in then-existing precedent." *Id.* Further, it is

5

necessary that that "legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Id.*

## I. False Arrest

Ruff contends that Defendants lacked probable cause to believe that she was committing any crime and therefore violated her Fourth Amendment rights when they nonetheless proceeded to arrest her. Such a claim is commonly referred to as one for "false arrest." *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014). "To prevail on a claim of false arrest, [a plaintiff] must show there was no probable cause for [her] arrest." *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012). "Because the presence of probable cause makes a warrantless arrest reasonable under the Fourth Amendment, the existence of probable cause is an absolute defense to a § 1983 claim for false arrest." *Gibbs*, 755 F.3d at 537 (internal quotation marks omitted).

Probable cause to arrest exists "when a reasonable officer with all the knowledge of the on-scene officers would have believed that the suspect committed an offense defined by state law." *Pierner-Lytge v. Hobbs*, 60 F.4th 1039, 1043 (7th Cir. 2023) (internal quotation marks omitted). A showing of probable cause "requires only that a probability or substantial chance of criminal activity exists; it does not require the existence of criminal activity to be more likely true than not true." *Thayer*, 705 F.3d at 246 (internal quotation marks omitted). "The test is a purely objective one, meaning that an officer's subjective motivations have no bearing on the inquiry." *Reher v. Vivo*, 656 F.3d 772, 776 (7th Cir. 2011). Moreover, a court must "account for the totality of the circumstances rather than dissecting every fact in isolation." *Pierner-Lytge*, 60 F.4th at 1043 (internal quotation marks omitted).

While Gochee told Ruff that she was being arrested for protesting without a permit, Defendants do not rely on that alleged crime as supporting the existence of probable cause to arrest Ruff. Instead, Defendants now claim that they had probable cause to arrest her for

disorderly conduct.[3] In Illinois, a person commits the crime of misdemeanor disorderly conduct when she "[d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 ILCS 5/26-1(a)(1). To commit the offense, "a person must engage in conduct that: (1) is unreasonable; (2) alarms or disturbs another; and (3) threatens to provoke or provokes a breach of the peace." *Reher*, 656 F.3d at 775. "The intent of the disorderly conduct statute is to guard against the invasion of the right of others not to be harassed without justification." *Purtell v. Mason*, 412 F. Supp. 2d 903, 912 (N.D. Ill. 2006). In applying subsection (a)(1) of the disorderly conduct statute, "Illinois courts have recognized that 'the types of conduct intended to be included under this section almost defy definition.'" *Gower v. Vercler*, 377 F.3d 661, 669 (7th Cir. 2004) (quoting *People v. Davis*, 413 N.E.2d 413, 415 (Ill. 1980)). "Whether particular conduct is disorderly therefore depends not only on the conduct itself but also on the conduct's unreasonableness in relation to the surrounding circumstances." *Penn v. Chi. State Univ.*, 162 F. Supp. 2d 968, 976 (N.D. Ill. 2001) (citing *Biddle v. Martin*, 992 F.2d 673, 677 (7th Cir. 1993)).

Here, Defendants decided to arrest Ruff based primarily on what they had learned from their two discussions with the two Store employees. "When police officers obtain information from an eyewitness or victim establishing the elements of a crime, the information is almost always sufficient to provide probable cause for an arrest in the absence of evidence that the information, or the person providing it, is not credible." *Pasiewicz v. Lake Cnty. Forest Pres. Dist.*, 270 F.3d 520, 524 (7th Cir. 2001); *see also Woods v. City of Chicago*, 234 F.3d 979, 997

---

[3] It presents no problem that Defendants now claim they had probable cause to arrest Ruff for a different crime than what they cited at the time of her arrest because an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

(7th Cir. 2000) ("[P]olice officers have no constitutional obligation to conduct any further investigation before making an arrest if they have received information from a reasonably credible victim or eyewitness sufficient to supply probable cause."). Ruff does not point to evidence that would have given Defendants any reason to doubt the Store employees' credibility. And because there is no dispute as to the substance of the information the Store employees conveyed to Defendants (and the complete audio of their interactions was captured by all three Defendants' body-worn cameras), the Court may decide as a matter of law whether Defendants had probable cause to arrest Ruff. *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 623 (7th Cir. 2010) ("While [the probable cause] determination is often left to the jury, the court may decide whether probable cause existed if the facts material to the probable cause determination are not in dispute.").

Considering Ruff's described actions together, the undisputed evidence establishes that Defendants could have reasonably concluded that Ruff's conduct was not that of a peaceful protestor but rather rose to the level of disorderly conduct. First, Defendants learned from the two Store employees that Ruff had been regularly protesting outside the Store for over two years. Moreover, the employees described Ruff as directing what could reasonably have been understood as harassing behavior toward customers who defied her plea not to shop at Missha and entered the Store anyway. Specifically, she would yell at customers going into the Store and ask them how much they spent as they departed. At the same time that she was chastising those customers, she would use her phone to record them going in and out of the Store. Normally, "[v]ideotaping other people in public, while potentially intrusive, is not illegal in Illinois," but "videotaping other people, when accompanied by other suspicious circumstances, may constitute disorderly conduct." *Reher*, 656 F.3d at 776. A customer could plausibly be alarmed by a

protestor who stands outside a business and videotapes customers while angrily scolding them for patronizing that business and asking how much they spent when they leave. In those circumstances, the videotaping may well be understood as an act of intimidation or implicit threat of retribution for failing to comply with the call to boycott.

More alarming and objectively unreasonable was what the Store employees told Defendants about how Ruff treated them and their coworkers. Indeed, the employees were fully aware that Ruff was not just filming them but also livestreaming the video. Certainly, the employee whose license plate was filmed and livestreamed might reasonably fear that Ruff was inviting her online audience to use the license plate to find out the employee's name or residence and come after that employee when he was off the clock. And Defendants learned from a Store employee that Ruff had, at least on one occasion, gotten a drunk person to attack and seriously injure another Store employee. Similarly, Defendants heard that Ruff made inflammatory false accusations about Store employees breaking the law by selling drugs and loose cigarettes and assaulting customers—accusations seemingly meant to stoke feelings of hostility against the Store's employees. The Store employees also told Defendants about the vitriol Ruff directed towards them during work hours. Considering Ruff's conduct in the context of her two-year long campaign of abuse directed against the Store and its employees, Defendants had reason to be concerned that the situation was combustible enough that even relatively tame insults like "Skinny Man" and "fat Black girl" could provoke a breach of the peace. *See Gower*, 377 F.3d at 669–70 (holding that officers had probable cause to arrest the plaintiff for disorderly conduct based on vulgar insults such as "big fat son-of-a-bitch" directed at his in-laws where the officers were aware of a "history of tension" between them); *see also Dukes v. Freeport Health Network Mem'l Hosp.*, No. 3:19-cv-50189, 2022 WL 1085208, at *9 (N.D. Ill. Apr. 11, 2022) ("Although

mere speech alone might not be enough, yelling and cursing accompanied by additional suspicious or harassing behavior may be enough to create probable cause.").

As described to Defendants, Ruff's protest activities had crossed the bounds of reasonableness. Rather than simply alerting potential customers to Missha's history of wrongful conduct and encouraging them to shop elsewhere, Ruff videotaped and castigated customers who chose to shop at the Store and persistently harassed the Store's employees. Such conduct easily could alarm or disturb the Store's customers and employees and, at least once, it did culminate in an act of violence against a Store employee. Taken together, the totality of the circumstances known to Defendants gave them probable cause to arrest Ruff for disorderly conduct. *See, e.g.*, *Abbott v. Sangamon County*, 705 F.3d 706, 714 (7th Cir. 2013) ("Probable cause to justify an arrest exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee ***had committed***, was committing, or was about to commit a crime." (emphasis added)).

Even if Defendants lacked probable cause to arrest Ruff for disorderly conduct, the Court would still find that they are protected by qualified immunity. "An officer 'is entitled to qualified immunity in a false-arrest case when, if there is no probable cause, a reasonable officer could have mistakenly believed that probable cause existed." *Thayer*, 705 F.3d at 247 (internal quotation marks omitted). And especially given the "[i]ndeterminate language in the [disorderly conduct] statute, such as 'unreasonable manner as to alarm or disturb another and to provoke a breach of the peace,'" police officers are usually afforded "broad discretion to determine whether the circumstances of a particular situation . . . provide probable cause to believe there has been a violation of the act." *Humphrey v. Staszak*, 148 F.3d 719, 727 (7th Cir. 1998); *see also Dukes*, 2022 WL 1085208, at *10 ("The loose nature of the [probable cause] statute and various courts'

struggles to define its scope . . . support[s] the defense of qualified immunity."). Consequently, if Defendants made a mistake in determining that the facts described to them provided probable cause to arrest Ruff for disorderly conduct, their mistake was a reasonable one and they would be entitled to qualified immunity as a matter of law.

## II. Mental-Health Evaluation

After arresting Ruff, Defendants decided that she should be taken to a hospital for a mental-health evaluation. "[S]eizures made to effectuate an involuntary mental health commitment are analyzed under the Fourth Amendment's 'probable cause' standard." *Fitzgerald v. Santoro*, 707 F.3d 725, 732 (7th Cir. 2013). And "[p]robable cause exists only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard." *Id.* (internal quotation marks omitted). In Illinois, the relevant standard is found at 405 ILCS 5/3-606. *Id.* That statute provides as follows:

> A peace officer may take a person into custody and transport him to a mental health facility when the peace officer has reasonable grounds to believe that the person is subject to involuntary admission on an inpatient basis and in need of immediate hospitalization to protect such person or others from physical harm.

405 ILCS 5/3-606. Ruff contends that Defendants did not have probable cause to believe that she required hospitalization to protect herself or others from harm.

The Court agrees. When Defendants arrived at the Store, Ruff was not behaving in a particularly belligerent manner. Nothing else occurred that day prior to her arrest that gave Defendants any reason to believe that Ruff presented an imminent danger to herself or anybody else. Instead, Defendants largely focus on the fact that the Store employees **believed** that Ruff was "delusional," "bipolar supposedly," and thought she had been called by God to protest against Missha. Combined with the fact that Ruff had once provoked a violent attack against a Store employee, Defendants contend that they were warranted in believing that Ruff presented a

11

threat of physical harm to herself or others. The Court finds that such belief was not supported by the facts known to the officers. First, that Defendants had reason to believe that Ruff was suffering from some mental-health issue would not, by itself, give them probable cause to effect a mental-health seizure; rather, the focus must be whether she presented a danger to herself or others. And while Ruff's behavior had resulted in an attack on a Store employee, Defendants had not been told when that incident occurred. Moreover, that Defendants were aware Ruff's protest activities occurred regularly and for an extended period but had caused only a single violent incident weighs against a conclusion that ***immediate*** hospitalization was necessary.

Despite Defendants not having probable cause to involuntarily subject Ruff to a mental-health examination, the Court nonetheless finds that they are protected by qualified immunity. Once qualified immunity is raised as a defense, it is the plaintiff's burden to defeat it. *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021). That requires a plaintiff to either "identify[] a closely analogous case or . . . persuad[e] the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott*, 705 F.3d at 723–24. Here, Ruff argues that Defendants are not entitled to qualified immunity because she was calmly engaged in her protest activities when she was seized, and nothing Defendants saw or heard gave them reason to think that she posed a danger to herself or others. As discussed above, the Court agrees with that proposition but it does not suffice to establish that Defendants violated clearly established law in nonetheless seizing Ruff.

As an initial matter, Ruff does not argue (and the Court does not believe) that the facts here are so egregious as to excuse Ruff from her burden of coming forward with an analogous case to show that the violation of clearly established law was obvious. That leaves it to Ruff to

follow the usual method of demonstrating that a legal rule is clearly established by showing that "it has 'a sufficiently clear foundation in then-existing precedent. The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority,' not merely 'suggested by' precedent." *Bass v. Dakuras*, No. 19 CV 7557, 2023 WL 5580416, at *4 (N.D. Ill. Aug. 29, 2023) (quoting *Wesby*, 583 U.S. at 63). While it is not required that a case be "directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (internal quotation marks omitted).

The Court observes that there is a relative dearth of authorities addressing when an officer lacks probable cause in the context of mental-health seizures. *Cf. Bass*, 2023 WL 5580416, at *5 (observing that the plaintiff "primarily cites cases where courts ***found*** probable cause" to make a mental-health arrest but explaining that "cases holding that probable cause existed based on different fact patterns do not help [the plaintiff] show, to a high degree of specificity, that [the defendant] did not have arguable probable cause to arrest her"). In nonetheless arguing that Defendants violated clearly established law, Ruff primarily relies on *Bruce v. Guernsey*, 777 F.3d 872, 878–79 (7th Cir. 2015), a case decided at the motion to dismiss stage that left open the possibility that the defendant might establish his qualified immunity defense after further discovery. By contrast, the qualified immunity question in this case is before the Court on a full factual record—one that shows Defendants knew that Ruff had once procured an attack on a Store employee, had heard the Store employees' accounts of Ruff's mental state, and knew of Ruff's prolonged, single-minded vendetta against the Store due to the actions of Missha employees in a wholly different state. Ruff comes forward with no controlling authority or robust consensus of persuasive authorities demonstrating that Defendants did not

have at least arguable probable cause for a mental-health seizure on those facts. *See Mwangagi v. Nielsen*, 48 F.4th 816, 825 (7th Cir. 2022) ("If an officer has arguable probable cause—meaning that a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law—we cannot say that the officer violated the plaintiff's clearly established constitutional rights." (internal quotation marks omitted)).

Notably, Defendants appear to have decided to send Ruff for a mental-health evaluation only after arresting her for disorderly conduct (an arrest the Court has now found was supported by probable cause) and did so in lieu of booking her at the police station. Thus, Defendants could have mistakenly believed that their probable cause to arrest Ruff for disorderly conduct also gave them probable cause to subject her to a mental-health evaluation. Indeed, there is no Seventh Circuit precedent addressing whether probable cause to arrest also furnishes probable cause to effect a mental-health seizure. On the other hand, the Second Circuit has addressed those circumstances. It determined that police officers' probable cause to believe that a person committed a criminal offense did not "obviate[] the need for probable cause for a mental health arrest." *Guan v. City of New York*, 37 F.4th 797, 807 (2d Cir. 2022). At the same time, it granted the officers qualified immunity because it "was not clearly established . . . that where police officers had probable cause to arrest a person for a criminal offense, they had to make a separate probable cause determination to arrest the person for an emergency psychiatric evaluation." *Id.* at 809. Likewise, here, the existence of probable cause to arrest Ruff for disorderly conduct furnishes a basis to afford Defendants qualified immunity as to the mental-health seizure, as it was not clearly established at the time that their probable cause to arrest could not also support their decision to have Ruff undergo a mental-health evaluation.

### III.    Excessive Force

Ruff also asserts that Defendants violated her Fourth Amendment rights by using excessive force to arrest her. "The Fourth Amendment prohibits the use of excessive force to seize a person in order to make an arrest." *Gupta v. Melloh*, 19 F.4th 990, 995–96 (7th Cir. 2021). Like with any other Fourth Amendment claim, an officer's use of force is "evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." *Lawrence v. Kenosha County*, 391 F.3d 837, 843 (7th Cir. 2004). "An officer's use of force is unreasonable from a constitutional point of view only if, judging from the totality of the circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009) (internal quotation marks omitted). A court's evaluation of the reasonableness of an officer's use of force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Gupta*, 19 F.4th at 996 (internal quotation marks omitted).

Summary judgment in excessive force cases is frequently inappropriate because "parties typically tell different stories about what happened," *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009), and "the evidence surrounding the officer's use of force is often susceptible of different interpretations," *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010). Nonetheless, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Thus, "a video record of the events at issue can evaporate any

15

factual dispute that would otherwise exist." *Kailin v. Village of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023) (internal quotation marks omitted). But the video evidence can only eliminate a factual dispute when it is so definitive that no reasonable jury could accept the non-movant's version of the facts. *Id.*

Here, the Court has video evidence—namely, the video captured by each of the three Defendant officers' body-worn cameras. While no single Defendant's body-worn camera kept Ruff consistently in frame throughout her arrest, the combined video evidence from all three Defendants leaves no room for interpretation regarding Defendants' use of force. As depicted in the video evidence, Defendants initiated Ruff's arrest upon exiting the Store following their second discussion with the two Store employees. Defendants approach Ruff, and Gochee asks her for identification or a permit to protest. When Ruff says she does not have a permit to protest, Gochee asks Ruff to put down her phone and the flag she is holding. Ruff then walks to her car and she places her flag through the open front-passenger-seat window. However, Ruff does not put down her phone, prompting Gochee to instruct her again to do so. Ruff asks why, and Gochee responds that Ruff has to put her phone down because she is under arrest for protesting without a permit. With her phone still in her hand, apparently recording, Ruff argues that she does not need a permit to protest. Gochee and another, non-Defendant officer then approach Ruff, and Gochee grabs the wrist of her arm holding the phone while the other officer grabs her opposite forearm. The non-Defendant officer, with assistance from Gochee, moves Ruff's hands behind her back and handcuffs her.

While she is being handcuffed, Ruff offers little physical resistance to the officers. After handcuffing Ruff, Gochee starts to walk Ruff toward a nearby police vehicle. They first stop by Ruff's vehicle to find her identification. Thomas starts to look through items in the front

passenger seat of Ruff's vehicle. Meanwhile, Gochee holds onto Ruff's arm around the elbow area, alternating between using one or both of his hands. While Ruff looks toward the front passenger seat of her vehicle, Gochee snatches Ruff's phone from her handcuffed hand. Ruff tells Gochee to give her the phone back but Gochee refuses, telling Ruff that she is being detained. After some back-and-forth between Ruff and the officers, the non-Defendant officer approaches Ruff on the side opposite from Gochee, who is still grasping one of Ruff's arms. As the non-Defendant officer moves to restrain Ruff's other arm, Ruff starts to lean away from Gochee and says, "No, no, no, I'm not going anywhere." With Gochee maintaining his grip on Ruff's upper arm, the non-Defendant officer grabs Ruff's other arm. Gochee then releases his grip and motions for Drowns to take his place.

At this point, Drowns and the non-Defendant officer are on either side of Ruff, each with one hand on one of Ruff's upper arms. They then begin to walk Ruff to the police vehicle, causing her to lean backwards and ask why the officers are grabbing her. During this time, Gochee approaches Thomas, who hands him a bag that she took from Ruff's vehicle. Ruff then says again that she does not need a permit to protest and crouches. Drowns and the other officer, both still with one hand on each of Ruff's arms, pull her back upright and continue walking toward the police vehicle. Ruff continues to insist loudly and repeatedly that she does not need a permit to protest.

When Defendants reach the police vehicle, Gochee retrieves Ruff's wallet from the bag that Thomas handed him. Ruff angrily demands that Gochee not go in her wallet. Drowns and the other officer, arms still linked around Ruff's, begin moving Ruff toward the police vehicle's backseat. As they do, Ruff can be seen sinking downwards with her knees bent. During this time, Ruff yells, "He's arresting me saying I need a permit to protest!", and when Gochee instructs the

other officers to put her in the car she yells, "No I'm not! No! No! No! No, I don't need a permit to protest!" Upon reaching the vehicle's rear door, the other officer releases his grip on Ruff. Drowns is now the only officer with his hands on Ruff. As Drowns tries to guide Ruff inside the vehicle, he has his forearm linked underneath Ruff's elbow. Ruff then exclaims, "Now you're hurting me!" Drowns then adjusts his restraint on Ruff so that he is grasping her upper arm with one hand and his other hand placed on the same forearm. He begins to push Ruff into the backseat. Ruff twice more cries out, "You're hurting me!" Once Ruff is seated in the backseat of the police vehicle, her body facing the officers outside, Drowns releases his grip and no Defendant is making contact with Ruff. Nonetheless, Ruff exclaims three more times that the officers are hurting her. Ruff then stands up and pleads with the officers to let her lock her car. Drowns puts his hands on Ruff's shoulders and pushes her into the police vehicle. Once Ruff is fully inside the vehicle, Drowns closes the door.

To begin, the Court finds (and it does not understand Defendants as contending otherwise) that the video evidence establishes that Ruff offered no more than passive resistance to her arrest. In particular, Ruff often questioned Defendants' basis for arresting her and made some unsuccessful efforts at resisting the officers' attempts to secure her arms or walk her toward the police vehicle. Still, even when she tried to physically resist the officers, she quickly conceded defeat and begrudgingly allowed herself to be taken to the police vehicle. *See, e.g.*, *Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020) (characterizing passive resistance as a refusal to move or follow lawful commands). "[A] police officer's ability to make a stop or an arrest 'necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" *Lawrence v. Kenosha County*, 391 F.3d 837, 843 (7th Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). But because Ruff offered no more than

passive resistance, Defendants could use "only minimal force" to effectuate her arrest. *Becker v. Elfreich*, 821 F.3d 920, 929 (7th Cir. 2016).

It is evident from the video evidence that no Defendant used more than the minimal force that was necessary to secure her arrest. Any force was applied solely by Defendants' hands or arms and involved only the gripping, grasping, pushing, and pulling needed to get Ruff inside the police vehicle. Moreover, the video evidence reveals that no Defendant made physical contact with Ruff outside her arms and shoulders. Nor did any Defendant use or brandish a weapon, strike Ruff in any way, or push or slam her against any surface. And Ruff remained on her feet the entire time. Ruff does not dispute those facts. Indeed, Ruff is not entirely clear as to why she believes that Defendants used excessive force, but simply contends that a jury could see the video and conclude that they had. The Court disagrees.

While Defendants may have pushed Ruff a bit while walking her to the police vehicle, her body did not jerk, jolt, or lurch in a way that might indicate that she had been subjected to an act of violence. Nor was Ruff forcibly dragged. Even when she crouched or leaned away from Defendants' physical pressure, Defendants only did what was necessary to keep her upright and moving forward. *See Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." (internal quotation marks omitted)); *Boothe v. Wheeling Police Officer Sherman (Star #155)*, 190 F. Supp. 3d 788, 797 (N.D. Ill. 2016) ("When an individual is resisting arrest, an officer can use the amount of force necessary to overcome her resistance."). Notably, Ruff did not complain about experiencing pain until just before she was seated inside the police vehicle and Drowns removed his hands from her body quickly after she began complaining. Nonetheless, Ruff continued accusing Defendants of hurting her even when she was seated in the vehicle with no Defendant

touching her. *See, e.g.*, *Bass*, 2023 WL 5580416, at *10 ("[T]he fact that a detainee complains of pain does not itself create a triable issue of fact in an excessive force case."). Given these uncontroverted facts and video evidence, no reasonable jury could find that any Defendant used an unconstitutional degree of force in arresting Ruff. And even if Defendants could somehow be found to have used excessive force, they would still be entitled to qualified immunity on these facts. *See Mullenix v. Luna*, 577 U.S. 7, 18 (2015) ("[Q]ualified immunity protects actions in the hazy border between excessive and acceptable force." (internal quotation marks omitted)).

## IV.     Failure to Intervene

For the reasons discussed above, the Court finds that there is no genuine dispute of material fact that would allow a jury to conclude that any Defendant's conduct on May 31, 2019, violated Ruff's clearly established Fourth Amendment rights such that they would not be protected by qualified immunity. It necessarily follows that Defendants are also at least entitled to qualified immunity as to Ruff's failure to intervene claim.  *See Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) ("As we have demonstrated, [the plaintiff's] right to be free from these interrogation tactics was not clearly established. It follows then, that the detectives would not have known a constitutional violation was committed, and therefore, cannot be liable for failure to intervene.").

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. No. 179) is granted and Plaintiff's motion for summary judgment (Dkt. No. 185) is denied. Summary judgment is entered for Defendants on Counts VII and VIII of the Third Amended Complaint.

ENTERED:

Dated:  September 30, 2024

Andrea R. Wood
United States District Judge